IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

UNITED STATES OF AMERICA         :   13 Cr. 066 (JPO)

      V.                              :

NICHOLAS COOPER,               :

                  Defendant.      :

------------------------------------------------------------------------x

## SENTENCING MEMORANDUM
## ON BEHALF OF NICHOLAS COOPER

**GOLDMAN and JOHNSON**
**500 Fifth Avenue, Suite 1400**
**New York, NY 10110**
**Telephone   212-997-7499**

**Attorneys for Nicholas Cooper**

Of counsel:

     Elizabeth M. Johnson (EJ-5971)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

UNITED STATES OF AMERICA                        :   13 Cr. 066 (JPO)

      V.                                                              :

NICHOLAS COOPER,                                      :

                         Defendant.          :

------------------------------------------------------------------------x

## SENTENCING MEMORANDUM
## ON BEHALF OF NICHOLAS COOPER

      This memorandum is submitted on behalf of Nicholas Cooper, who is
scheduled to be sentenced on September 18, 2013, upon his conviction by plea
of guilty to one count of enticement of a minor to engage in illegal sexual activity
in violation of 18 U.S.C. § 2422(b).  This charge carries a statutory mandatory
minimum sentence of 10 years.  Id.  We respectfully request the Court impose a
sentence no higher than the ten year statutory minimum.


## NICHOLAS COOPER'S PERSONAL BACKGROUND

      Nicholas Cooper is a 26 year-old man who has suffered from severe
depression, anxiety and attention deficit and hyperactivity disorder ("ADHD") for
most of his life.  He has had significant social difficulties in addition to, or
because of, his psychiatric illness.  While he grew up surrounded by a loving
family, it was always extremely difficult for him to form relationships with his
peers.  As a teenager, Mr. Cooper's realization that he was gay made it even

more difficult for him to function socially in his conservative rural hometown. Computers and the internet provided an escape and a way to connect to others that became central to Mr. Cooper's life starting in high school and continued until his arrest.

Mr. Cooper has lived his entire life, except the years he attended college in New York, in the same house on three acres of land in Danville, a small town in central Pennsylvania. The nearest neighbors are his grandparents. His father works as a machine operator. His mother stayed home until Mr. Cooper started school, in part because when he started day care "he could not relate to children and he was bullied at the daycare . . . he was constantly sick." Letter of Barbara Cooper, Exh. 2 at 1.

Mr. Cooper had continued social difficulties when he started attending school, although he was successful academically. See PSR ¶¶ 43, 67.[1] His friend Zane Winey recalls both qualities from his school years with Mr. Cooper: "He's always been academically gifted . . . . His knowledge and intelligence are among the very few things he has confidence in. When we were kids, he tried to show off his intelligence to make friends . . . . I think he accidentally pushed a lot of people away that way." Letter of Zane Sharadin Winey, Exh. 4 at 1-2. Mr. Cooper explains: "How exactly it was that I did not fit in is hard to explain, but generally I simply felt as if I did not." Letter of Nicholas Cooper, Exh. 1 at 1. Mr. Cooper's difficulties led to a diagnosis of ADHD in third grade. PSR ¶ 54. He received therapy to address his issues for a short time, but his family

---

[1] References are to the draft Pre-Sentence Report ("PSR") dated August 16, 2013. The final PSR has not yet been received.

discontinued it when it did not appear to help Mr. Cooper.  Subsequently in middle school he again started therapy which was intended to address depression.  PSR ¶ 55.  From at least that time, Mr. Cooper has continually struggled with his severe psychiatric illness.

One situation in which Mr. Cooper was able to form good relationships with people his age was his Boy Scout troop.  He describes the troop as "the only social outlet in which I found any sense of belonging."  Exh. 1 at 2.  His parents were active in the troop leadership and Mr. Cooper's younger brother, Christopher, also joined.  As his mother writes, the troop "was able to carry on such intellectual conversations they spent hours on campouts around the fire discussing a variety of topics."  Exh. 2 at 2.   Mr. Cooper ultimately earned his Eagle Scout award, Boy Scouting's highest award, which required him to design and implement a service project in his community.  Exh. 16 (press clippings) at 1-2; Letter of Gerard Stopnicky, Exh. 15 at 2.  One of his teachers, Cheryl Cooper (no relation) notes that Scouting was a valuable experience for Mr. Cooper because it allowed him "to work at his own pace on tasks of interest to him."  Letter of Cheryl Cooper, Exh. 5 at 1.  Mr. Cooper also went out of his way to help other boys in his troop.  The father of one of these Scouts, a boy with autism, remembers Mr. Cooper's efforts: "Nicholas was among a few older Scouts who took William under wing.  Teaching him, laughing with him, helping him learn not only Scouting skills but life skills as making eye contact, how to tell whether others are joking or not, and how to hold a conversation. . . .  Nick did all this

3

while maintaining his own high academic standards, playing in the high school marching band, and more." Exh. 15 at 2.

Mr. Cooper also tried to help out often at his school and in his community, including such efforts as recommending appropriate books for his school library to purchase, helping the local Red Cross move offices, building computers for friends, working around his grandparents' farm and helping with their computer problems, and helping the Danville Ambulance service improve its payroll reporting system. Letters of W. Michael Nailor, Gary L. Cooper, Joshua Pisarcik, Stanley E. and Mary E. Crone, and Scott E. Lynn, Exhs. 6, 3, 7, 8, 9, respectively. He was an inspiration to his younger brother, Christopher Cooper, now a student at Rochester Institute of Technology, who describes him as playing "a huge part in many of my accomplishments and successes." Letter of Christopher A. Cooper, Exh. 10 at 1.

Outside of his Boy Scout troop, Mr. Cooper was rarely able to relate well to his peers. He was generally more comfortable talking to adults, despite the gaps in age and experience. Mr. Cooper describes himself: "Growing up I had few friends and fewer still that lasted for any great length of time, so I tended to find more commonality with adults than with my peers." Exh. 1 at 1. Several of the letters submitted to the Court refer to Mr. Cooper's comfort in relating to adults; for example, his teacher Cheryl Cooper recalls that Mr. Cooper would "gravitate to being isolated away from the rest of the class or prefer to be in the presence of adults." Exh. 5 at 1. He considered it normal for a teen like himself to spend time socializing with adults.

4

Mr. Cooper's social difficulties became even more pronounced when he came to realize that he was gay starting around the age of eleven.  PSR ¶ 44. He was afraid to be open about his sexuality because he did not think his family or friends would accept him.  This fear even undermined his therapy; as his mother writes, "[h]e was afraid to talk to his doctors about being gay because he thought we would find out and turn against him."  Exh. at 2.  Mr. Cooper was also afraid that he could not continue in Scouting if he were known to be gay.  "As I was a Boy Scout, the repercussions of being gay could easily have cost me the only social outlet I had found any sense of belonging.  The Anti-gay rhetoric of BSA was reaching a crescendo and was thus constantly on my mind."  Exh. 1 at 2.

The one place Mr. Cooper felt he could be open about himself was the internet.  As he writes to the Court, "The pervasive anti-gay attitudes in Central Pennsylvania and my fears about what might occur should it be discovered I was gay made me so cautious that I was unable to find any of the support I might have in everyday life.  On the internet I was able to be open about these aspects of myself."  Exh. 1 at 2.  From high school until his arrest in this case and resulting bail restrictions which prohibited his use of the internet, Mr. Cooper lived much of his life on-line.  He played games, participated in chat rooms, and used a variety of programs to communicate with friends, relatives, acquaintances, and virtual strangers he had "met" elsewhere on the internet.  It was a place he could be open about himself and try to form relationships and social connections he had difficulty with in direct, face-to-face human interaction.  It also contributed to

his social isolation.  His mother observes:  "In high school he started spending every available minute on the computer.  The computer was his way to avoid real life.  With the difficulty of cultivating friendships in person he turned to the internet."  Exh. 2 at 2.

Chat rooms and instant messaging allowed Mr. Cooper for the first time to communicate with other gay men and teens, and to talk openly about his sexuality.  It was not until he was in college that Mr. Cooper was able to talk to his parents about being gay.  See Exh. 2 at 2.  They have been supportive of him but recognize many people, particularly in Danville, are not so accepting.  His mother writes:  "Being gay in our very conservative community is difficult.  We have all seen gays ostracized and for someone like Nicholas that is sensitive to criticism and wants everyone to like him, it has been extremely difficult."  Exh. 2 at 2.

Throughout his teen years, depression and anxiety plagued Mr. Cooper.  As Mr. Cooper writes, "All of this pressure had been a lot to try and handle which pushed me into the realm of suicidal thought."  Exh. 1 at 2.  At one point in high school, he attempted suicide but could not complete the attempt.  He has continued to have suicidal thoughts for over a decade, including a recurrent belief that he would be killed by a police officer.  See Letter of Kathryn M. Lindenfeld, Psy.D. to Elizabeth Johnson dated June 22, 2013, Exh. 11 at 1.[2]  His friends recognized Mr. Cooper's difficulties, but felt unable to help him.  Zane Winey writes, "He mentioned suicide more than once through high school and college.

---

[2] Dr. Lindenfeld's letter is handwritten.  As a courtesy, we have also provided a typed version; references are to the pages of the typed letter.

It was really difficult sometimes, because I couldn't really do a lot to help." Exh. 4 at 2.

After graduating from the local high school's gifted program, Mr. Cooper moved to New York to attend college at Cooper Union in 2005. PSR ¶¶ 66, 67. In New York, he felt more able to be open about himself, and to meet people who shared his interests. He was still depressed, however, and was "still much more isolated than I could handle." Exh. 1 at 2. He found completing his college coursework extremely difficult. His psychiatric conditions made him feel his work could never be adequate and led to extreme procrastination and an inability to seek help.

Over a seven-year period, Mr. Cooper attended three separate institutions – Cooper Union, Hunter College, and CCNY – without earning a degree. PSR ¶¶ 64-66. His academic failures fueled his depression. His college friend Nicholas Powel says: "Since he failed out of Cooper Union, I have watched as he has become progressively worse. His depression and sense of isolation has increased." Letter of Nicholas Powel, Exh. 12 at 1. Another friend from New York, Noah Heau, describes Mr. Cooper this way: "It is true that Nick's self-proclaimed social deficits and his subsequent rejection from certain friend circles have led him to feel depressed and lonely throughout his life. Nicholas values any form of social interaction very highly, since he is accustomed to living a life of isolation." Letter of Noah Heau, Exh. 13. Mr. Cooper's mother saw the same problems: "[H]is depression was getting worse and it was keeping him from doing well in school. His hours were spent on the computer, which had become

an extension of himself." Exh. 2 at 3.  He took out large amounts of student debt to finance his education, in some cases co-signed by his parents, which he is now unable to pay off.  PSR ¶¶ 49, 75-76.  Mr. Cooper became more depressed, more isolated, and spent more time seeking interaction online to distract himself.

Finally, Mr. Cooper's parents decided they could no longer financially support him while he attended college and lived away from home.  After completing the spring 2012 semester at CCNY, Mr. Cooper intended to move out of his New York apartment and back to Danville.  In May 2012, the FBI obtained a search warrant for his apartment.  During the search, Mr. Cooper expressed suicidal thoughts and as a result was involuntarily committed to Harlem Hospital. PSR ¶ 58.  After nine days, he was released, although hospital staff recognized his need for continued treatment.  He moved back home with his parents and looked for work.  However, without a degree and living in an economically depressed area, it took months for Mr. Cooper to obtain even a temp job.  In the fall of 2012, he obtained shift work at Kawneer, a local manufacturing company. He held that temp position for almost three months, until January 2013.  PSR ¶ 70.  Mr. Cooper also did some administrative work for his mother's accounting business, and pitched in around his family home with repairs and renovations. See Exhs. 2 and 3.  After his arrest and release on bail, Kawneer offered to reemploy him but Mr. Cooper's bail conditions prohibited it.

Recognizing his depression and anxiety were significant causes of his academic difficulties, in 2010 Mr. Cooper again started therapy and was subsequently prescribed psychiatric and ADHD medications.  PSR ¶¶ 56, 57.

When he moved back to Danville in June 2012, he continued therapy with Dr. Kathryn M. Lindenfeld, and also continued taking medication as prescribed by a psychiatrist. PSR ¶ 59. Except for the time he was incarcerated at MCC prior to his release on bail in this case, when he did not receive any of his prescribed medications, Mr. Cooper has continued to take anti-depressants, anti-anxiety medication, medication for ADHD, and a sleep aid every day. Without these medications, it is even more difficult for him to focus or to sleep, and his depression becomes almost unmanageable. As Mr. Cooper writes to the Court: "That month without my medication had my psychological state decline rapidly and is the most horrible experience of my life. Even writing this and remembering it cause me great anxiety." Exh. 1 at 2. Even with his medication and therapy, Mr. Cooper has constant suicidal thoughts (although no intent to act on them) and great difficulty motivating himself, even to talk about what will help him. See Exh. 11 at 1; Exh. 2 at 1; Exh. 3 at 1-2.

Mr. Cooper is well aware of his need for treatment if he is to be a functioning member of society: "More than anything else I need counseling and medication to help me get my problems under control. If I am able to be the stable and productive citizen I wish to be, I need that kind of help." Exh. 1 at 2. His family and friends also recognize the debilitating nature of his psychiatric illnesses. His mother notes, "I believe the reasons he functions at a lower maturity level may be due to emotional pain. . . . Nicholas suffers from severe depression." Exh. 2 at 1-2. His father says: "Depression is something he was diagnosed with in 3rd grade and it has gradually gotten worse." Exh. 3 at 1. His

9

friend Nicholas Powel describes Mr. Cooper as a person "with poor social skills, low self esteem, and severe depression." Exh. 12 at 1. It is clear that Mr. Cooper's mental illness has held him back in virtually every aspect of his life. For him to move forward and become someone who can support himself and contribute to society, he needs at a minimum continued therapy and medication.

## OFFENSE CONDUCT

Count One of the indictment in this case charges Mr. Cooper with violating 18 U.S.C. § 2422(b) in December 2009.[3]  At that time, Mr. Cooper was only 22 years old and near the end of the semester at college. He was under a great deal of pressure to complete his coursework, and anxious about returning home to Pennsylvania for the holidays. As he often did in response to stress, Mr. Cooper increased his already high amount of time spent online, seeking out people to talk with in chat rooms and pursuing conversations with willing participants. One of those conversational participants identified himself as a fifteen year old living in New York City, and in the course of their instant messages – in which both participants made sexually explicit statements – Mr. Cooper committed the crime to which he has pleaded guilty by persuading the minor to come to his apartment to have sex.[4]

On May 23, 2012, a search warrant was executed at Mr. Cooper's apartment. He was subsequently arrested at his family home in Pennsylvania on

---

[3] Pursuant to the plea agreement in this case, the remaining counts of the indictment will be dismissed at sentencing.
[4] Sexual contact as relevant here between a 22 year old and a 15 year old is under New York law an E felony which does not carry a mandatory prison sentence. PL § 130.40(2).

February 5, 2013, and pled guilty to Count One of the indictment pursuant to a plea agreement on May 20, 2013.

## THE SENTENCING DETERMINATION

The crime to which Mr. Cooper pled guilty carries a statutory mandatory minimum sentence of ten years.  18 U.S.C. § 2422(b).  However, according to the PSR and as set forth in the plea agreement, Mr.Cooper's Guidelines offense level is 29.  PSR ¶ 35.  Based on Mr. Cooper's lack of criminal history, this offense level results in a Guidelines sentencing range of 87-108 months, PSR ¶ 80, less than the statutory minimum.  Pursuant to U.S.S.G. § 5G1.1(b), the Guidelines range is increased to the mandatory minimum.  PSR ¶ 80.  The plea agreement does not allow Mr. Cooper to seek or suggest a sentence other than the stipulated Guidelines sentence of 120 months.[5]  The agreement does not bind the Court. We respectfully request the Court impose a sentence no higher than the mandatory minimum.[6]

In determining a defendant's sentence, a court may consider virtually any information regarding the defendant's "background, character and conduct."  U.S.S.G. § 1B1.4.  After considering such information, Congress has directed that:

---

[5] Because of this provision in the plea agreement, we do not argue for a sentence below 120 months – even though we believe a lower sentence would be more than sufficient to further the legitimate goals of sentencing – nor that the statutory mandatory minimum violates the Eighth Amendment's prohibition on cruel and unusual punishment as applied to Mr. Cooper.  See United States v. C.R., 792 F.Supp.2d 343 (E.D.N.Y. 2011) (Weinstein, J.) (holding five year mandatory minimum for child pornography offense unconstitutional as applied to immature and young defendant).

> **The court shall impose a sentence sufficient, but not greater than necessary,** to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider --

> (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2)   the need for the sentence imposed --

>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

>> (B) to afford adequate deterrence to criminal conduct;

>> (C) to protect the public from further crimes of the defendant; and

>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a) (emphasis added). In this case, considering all the 3553(a) factors, a sentence above the stipulated Guidelines range would clearly be "greater than necessary."

A ten-year sentence clearly reflects the severity of the offense and the circumstances of Mr. Cooper's conduct. It is also unquestionably sufficient to provide just punishment to Mr. Cooper. While a ten-year sentence is a severe punishment for virtually any offender, Mr. Cooper's "history and circumstances," particularly his persistent and severe mental illness, make it even more so. He has generally functioned best when he has the support of his family on a regular basis to assist him with even basic life tasks. While he was able to excel in

---

[6] Generally speaking, absent a motion pursuant to U.S.S.G. § 5K1.1 by the Government, a court cannot impose a sentence below a mandatory minimum enacted by Congress. 18 U.S.C. § 3553(e).

school while living at home, once he was away from home, his academic

performance plummeted and his social isolation and depression grew.

Mr. Cooper was unable to manage his psychiatric illness on his own, even after

he started treatment. Several letters submitted to the Court have described his

family's central role in Mr. Cooper's life. His former teacher, Cheryl Cooper,

writes regarding Mr. Cooper's Scouting: "His mother and father were

instrumental in providing guidance and support for Nicholas as he struggled to

complete his badges and requirements for the [Eagle Scout] award. The support

of his family during this time was paramount." Exh. 5 at 1. Both his parents have

noted his great difficulty in doing things to help himself. His father writes, "He

doesn't know how to deal with issues or how to protect himself." Letter of Gary L.

Cooper, Exh. 3 at 2. His mother says: "What comes easy to most people does

not to Nicholas. When he was in MCC the guards thought he was acting stupid

when he could not determine how to arrange for use [sic] to visit or to make

phone calls to him." Exh. 2 at 1. His current therapist, Dr. Kathryn Lindenfeld, is

extremely concerned about Mr. Cooper's imprisonment because: "His poor

socioemotional skills disable him from accurately reading contextual cues and

also prevent him from connecting with others for a sense of community or

protection. His social isolation keeps him very vulnerable." Exh. 11 at 1. For

such an individual, a ten-year sentence is more than adequate to provide just

punishment.

Ten years is also more than sufficient to provide "adequate deterrence."

18 U.S.C. § 3553(a)(2)(B). As Judge Weinstein has observed regarding the

lower five year mandatory minimum for distribution of child pornography, "[n]o rational person would commit this crime were he aware of the likelihood of the punishment imposed." United States v. C.R., 792 F.Supp.2d 343, 516 (E.D.N.Y. 2011); see also United States v. Shipley, 560 F.Supp.2d 739, 745 (S.D. Iowa 2008) (ninety-month sentence sufficient to "provide adequate deterrence" to child pornography offenders "if they are capable of being deterred"). This is all the more true for a ten-year mandatory minimum.

A sentence greater than ten years is also not required to protect the public. There is no suggestion that, since the initial search by the FBI, Mr. Cooper has continued to offend in any way. He has fully complied with his extremely strict bail conditions, PSR ¶ 8, which include a complete ban on the use of computers and the internet, despite the fact that the vast majority of his social life had been conducted online. He has no previous criminal history. PSR ¶¶ 36-38. It is also noteworthy that his criminal conduct can be seen as a "result, to a substantial extent, of immaturity, lack of judgment, and social isolation." United States v. Jacob, 631 F.Supp.2d 1099, 1118 (N.D. Iowa 2009) (immaturity and youth mitigating factors in determining sentence for, inter alia, two counts of enticing a minor). Mr. Cooper explains in his letter to the Court:

> I am deeply regretful of the bad decisions I have made. I would do
> anything to be able to alter that period in my life . . . . While I am
> not one to ever give absolute certainty on any future action, I will
> break from form and can give you 100% absolute assurance that
> nothing like this will ever occur again in my life.

Exh. 1 at 3. A ten-year sentence imposed on Mr. Cooper would not only be adequate for general deterrence but for specific deterrence and to protect the public.

Mr. Cooper's need for continued therapy and psychiatric medication is also relevant to determining a proper sentence consistent with 18 U.S.C. § 3553(a)(2)(D)'s mandate that the Court consider the "most effective manner" to provide medical care to the defendant. Unfortunately, based on Mr. Cooper's experience with pretrial confinement, it appears unlikely that he will receive adequate care while imprisoned. He did not receive any of the medications prescribed for him, or any medication generally used to treat anxiety, depression or ADHD while he was at MCC. He was instead given a medication which treats bipolar disorder – something he has not been diagnosed with – which did not reduce his symptoms. His mental condition deteriorated significantly while in custody.[7] He describes that time as "the most horrible time in my life." Exh. 1 at 2. He became very depressed and retreated into himself, never managing to arrange even for phone privileges. See Exh. 2 at 1. He also suffered high levels of anxiety as a result of his fear of violence from other inmates. Exh. 1 at 2. It is difficult to believe that Mr. Cooper could be sufficiently proactive while in prison to receive adequate care or medication or that imprisonment will not worsen his mental health. He should not be required to receive inadequate care for any longer than necessary.

---

[7] His deterioration did not result in any disciplinary problems. PSR ¶ 7.

## CONCLUSION

For all the reasons set forth above, we respectfully request that the Court

impose a sentence of no higher than 120 months.

Dated:        New York, New York
              September 4, 2013

                                        Respectfully submitted,

                                        GOLDMAN and JOHNSON

                                        By:  _____
                                             Elizabeth M. Johnson (EJ-5971)

                                        500 Fifth Avenue, Suite 1400
                                        New York, NY 10110
                                        Telephone    212-997-7499

                                        Attorneys for Nicholas Cooper

Of counsel:

        Elizabeth M. Johnson (EJ-5971)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

UNITED STATES OF AMERICA        :   13 Cr. 066 (JPO)

      V.                           :   **AFFIDAVIT OF**

                                             **SERVICE**

NICHOLAS COOPER,             :

                         Defendant.    :

------------------------------------------------------------------x

STATE OF NEW YORK   )
                      : ss.:
COUNTY OF NEW YORK )

       ANN MARIE PRUNELLA, being duly sworn, deposes and says:

      1.    I am not a party to this action, am over 18 years of age, and reside in Kings County, New York.

      2.    On September 4, 2013, I served upon the following individuals a true and correct copy of the Sentencing Memorandum on Behalf of Nicholas Cooper, service of which was made by filing same via the Court's ECF system:

             AUSA Damian Williams
             United States Attorney's Office
             Southern District of New York
             One Saint Andrew's Place
             New York, NY 10007

                                 _____
                                 ANN MARIE PRUNELLA

Sworn to before me this
4th day of September, 2013.

_____
Notary Public
ROBERT J. SHAPIRO
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02SH5030487
QUALIFIED IN SUFFOLK COUNTY
CERTIFICATE FILED IN NY COUNTY
COMMISSION EXPIRES JULY 18, 20__

EXHIBIT LIST

### United States v. Nicholas Cooper
### 13 Cr. 066 (JPO)

**SENTENCING MEMORANDUM ON
BEHALF OF NICHOLAS COOPER**

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 1 | Letter of Nicholas A. Cooper dated August 22, 2013 |
| 2 | Letter of Barbara A. Cooper dated August 7, 2013 |
| 3 | Letter of Gary L. Cooper dated July 30, 2013 |
| 4 | Letter of Zane Sharadin Winey dated July 28, 2013 |
| 5 | Letter of Cheryl Cooper dated July 25, 2013 |
| 6 | Letter of W. Michael Nailor dated July 10, 2013 |
| 7 | Letter of Joshua Pisarcik dated August 1, 2013 |
| 8 | Letter of Stanley E. and Mary E. Crone dated July 28, 2013 |
| 9 | Letter of Scott E. Lynn dated July 28, 2013 |
| 10 | Letter of Christopher A. Cooper dated July 27, 2013 |
| 11 | Letter of Kathryn M. Lindenfeld, Psy.D. dated June 22, 2013 |
| 12 | Letter of Nicholas Powel dated August 15, 2013 |
| 13 | Letter of Noah Heau (without date) |
| 14 | Letter of Denise Pisarcik dated August 21, 2013 |
| 15 | Letter of Gerard Stropnicky dated August 28, 2013 |
| 16 | Press Clippings re Nicholas Cooper Achievements |